**IN THE UNITED STATES COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LIN LAN and J. WILLIAM MORRIS,　　　　)
on behalf of themselves and all　　　　　)
others similarly situated,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)　　　1:06cv114-SJM
　　　　　　　　Plaintiffs,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
JEFFREY A. LUDROF, et al.,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　　　　　)

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

Presently pending before the Court in the above-captioned class action lawsuit is a motion by the Plaintiffs, on behalf of the Class, for court approval of a proposed settlement of the litigation and allocation of settlement proceeds.  Also pending is a motion by Class Counsel for an award of attorneys' fees, reimbursement of expenses, and incentive awards to the two lead Plaintiffs in the case.  Generally speaking, there have been no objections by class members with respect to the amount of the settlement fund, the proposed plan of allocation, or counsels' request for expenses and incentive awards.  Notably, however, one class member – Naomi Purchase, putatively, the largest shareholder of the affected Class,[1] has objected to Class Counsels' fee request.  Mrs. Purchase both objects to the amount of fees sought by Class Counsel and seeks an award of fees and expenses on behalf of her own counsel relative to work performed in the related case of *Purchase, et al. v. Ludrof, et al.,* 1:06-cv-130 (W.D. Pa.).

---

[1] Mrs. Purchase has represented in related class action litigation that she holds or has held over 60,000 shares of EFL stock and that, to the best of her knowledge, she is the individual with the largest financial interest in the relief sought by the class in that action.  *See Purchase v. Ludrof, et al.*, No. 1:06-cv-130 (W.D. Pa.) (McLaughlin, J.), *Memorandum of Points and Authorities in Supp. of Naomi Purchase's Mot. for Appointment of Lead Plaintiff and Approval of Selection of Counsel* [Doc. # 15] at p. 7 of 14.

This Court has jurisdiction over the instant case pursuant to 28 U.S.C. § 1332(a)(1), as Plaintiff Lin Lan and Defendants are citizens of different states and the matter in controversy with respect to Ms. Lan exceeds $75,000, exclusive of interest and costs. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to the claims of Plaintiff J. William Morris and other members of the Class. The following constitute the Court's findings of fact and conclusions of law with respect to these motions.

## I. BACKGROUND

*A.      The Underlying Facts and Preliminary Litigation*

This litigation arises out events which occurred in connection with a May, 2006 tender offer (the "Tender Offer") for the outstanding publicly owned shares of Erie Family Life Insurance Company ("EFL"). The Tender Offer was undertaken by Erie Indemnity Company ("EIC") and Erie Insurance Exchange ("Exchange"), the majority shareholders of EFL, in an effort to take EFL private through what is known as a "two-step merger."

Prior to the Tender Offer which forms the basis of this litigation, EIC and Exchange together owned approximately 75% of the shares of EFL. On March 21, 2006, EIC and Exchange issued a press release announcing a Tender Offer to purchase essentially all of the shares of EFL that they did not already own for a price of $32.00 per share. This price represented a 6.7% premium over the closing price of EFL shares as of March 21, 2006. In their press release, EIC and Exchange disclosed their intention, in the event that they were successful in increasing their holdings to more than 80% of EFL's shares, to effect a short-form merger with EFL pursuant to 15 Pa. C.S.A. §1924.

The Tender Officer was subject to the condition that it must be accepted by a majority of the shares not owned or controlled by EIC, the Exchange, or their affiliates. Thus, the offer required that only 1,187,827 of the 2,350,538 minority shares be

2

tendered in order that EIC and Exchange could thereafter engage in a short-form merger without further shareholder approval. The offer further provided that, in the event the short-form merger was accomplished, any non-tendering shareholders would receive the same compensation (*i.e.*, $32.00 per share) as those who initially tendered their shares. In addition, shareholders were advised that any shareholder who did not wish to accept the $32.00 per share offer would be entitled to pursue statutory appraisal rights pursuant to 15 Pa. C.S.A. §§ 1571 *et seq.*

EIC and Exchange filed the required Tender Offer Statement and Rule 13e-3 Transaction Statement with the United States Securities and Exchange Commission ("SEC") on or about April 27, 2006. In addition, EFL filed its Solicitation/ Recommendation Statement under § 14(d)(4) with the SEC. Collectively, these documents disclosed the fact that all members of EFL's board of directors were also directors of EIC, and consequently EFL had no independent directors to evaluate the terms of the Tender Offer on behalf of EFL shareholders. The documents further disclosed that EFL's board of directors had determined not to make any recommendation to the shareholders with respect to whether or not they should accept the Tender Offer. No independent valuation expert had been retained to provide services on behalf of the minority EFL shareholders.

The Tender Offer was scheduled to close on May 24, 2006.

On May 15, 2006 Plaintiff Lin Lan commenced this action by filing a Class Action Complaint on behalf of herself and all similarly situated minority shareholders of EFL who had suffered or would suffer injury as a result of the Defendants' actions in connection with the Tender Offer. Lan's sole cause of action was one for breach of fiduciary duty against the following Defendants: (1) EIC, Exchange, and EFL (collectively, the "Corporate Defendants"); and (2) numerous individuals (the "Individual Defendants") who were affiliated with the Corporate Defendants as officers and/or directors of EIC, EFL, and/or other Erie Insurance companies. The complaint alleged that these Defendants had breached their fiduciary duties to the Plaintiff and other

3

similarly situated minority shareholders by, *inter alia*, offering an unfair and inadequate price arrived at by unfair procedures and failing to provide sufficient information in the Tender Offer documents and otherwise by which the EFL minority shareholders could make an informed decision as to whether to tender their shares.

Defendants subsequently filed an amendment to the Tender Offer documents on May 19, 2006. Thereafter, on May 25, 2006, Plaintiff Lan, joined by new Plaintiff J. William Morris, filed their First Amended Class Action Complaint ("FAC") against the Defendants, once again alleging a claim on behalf of all similarly situated EFL minority shareholders for breach of fiduciary duty by the Defendants in connection with the Tender Offer. Like the original complaint, the FAC premised the breach of fiduciary duties claim upon the Defendants' alleged offering of an unfair and inadequate tender offer price arrived at by unfair procedures and their alleged failure to provide sufficient information in the Tender Offer documents and otherwise from which EFL minority shareholders could make an informed decision about whether to tender their shares. However, the FAC identified specific facts and disclosures in support of the allegation that the Tender Offer documents had been unreasonably slanted so as to lead the minority stockholders to believe that both the proffered $32.00/ share price and the underlying valuation method were fair.

On June 1, 2006, a separate class action lawsuit arising out of the Tender Offer was commenced in this Court by Naomi Purchase, naming essentially the same Defendants as were named in the *Lan* action. *See Purchase, et al., v. Ludrof, et al.,* 1:06-cv-130 (W.D. Pa.). Like Ms. Lan, Mrs. Purchase asserted a claim for breach of fiduciary duty and complained that the Defendants had used their board positions and/or control over EFL to essentially "freeze out" EFL's minority shareholders at an unreasonably low price and through unfair means. However, unlike Lan, Purchase included in her complaint a claim under Section 14(e) of the Securities Exchange Act of 1934 (commonly known as the "Williams Act") based on allegations that Defendants had committed fraud in connection with the Tender Offer by manipulating downward to

4

$32 the price at which the Tender Offer was consummated, and by failing to disclose such manipulation in the Tender Offer documents, thereby providing false and misleadingly incomplete information to the EFL shareholders in connection with their decision whether or not to tender their EFL shares.

Meanwhile, in the *Lan* action, the Defendants filed their answers to the Amended Complaint and this Court entertained an initial case management conference on August 21, 2006. At that conference, a date of February 21, 2007 was established as a deadline for initial discovery.

Discovery in this case proceeded accordingly. In mid-July, Plaintiffs' counsel served Defendants with requests for the production of documents. Thereafter, Plaintiffs' counsel subpoenaed third parties, including Cochran Caronia Waller Securities ("CCW") and Houlihan Lokey Howard and Zukin, who had served as consultants to Defendants in connection with the Tender Offer, and Archstone Consulting, who had provided financial advice to Defendants in and around the time the Tender Offer was being considered. Following extensive discussions and negotiations with counsel for Defendants and their consultants, Plaintiffs' counsel were ultimately provided, and reviewed, in excess of 20,000 pages of documents in response to their discovery requests.

On October 11, 2006, counsel involved in the *Lan* and *Purchase* actions submitted to the Court a stipulation and proposed order [Doc. # 61] relative to the coordination of discovery in the two cases, which was approved by the Court that same day [Doc. # 62]. Among other things, the stipulation provided that the Defendants would provide Mrs. Purchase's counsel with copies of all documents produced in the *Lan* action as soon as possible and that all depositions in the two actions would be noticed jointly but taken only once, with *Lan* counsel generally asking questions first and *Purchase* counsel asking questions thereafter.

At the case management conferences held on August 21 and September 22, 2006 in the *Lan* case, the topic of class certification was discussed and this Court

5

inquired, on at least one occasion, whether it would be appropriate for the parties to resolve the issue of class certification by way of stipulation. The parties did subsequently stipulate to: (a) certification of a class comprised of "[a]ll shareholders of Erie Family Life on May 25, 2006, except Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants," *see* Order Regarding Class Certification [Doc. # 65] at p. 2 ¶ 1; (b) certification of Plaintiffs Lin Lan and J. William Morris as class representatives with respect to the breach of fiduciary duty claim asserted in the FAC; and (c) appointment of Wechsler Harwood, LLP, by William R. Weinstein, Esq., as Class Counsel. (*Id.* at p. 4, ¶ 3.) On October 20, 2006 this Court approved the Stipulation, making these certifications official. *Id.*[2]

In the meantime, on August 18, 2006, the Individual Defendants in the *Lan* Action moved to dismiss the Amended Complaint and for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on the grounds that Plaintiffs were precluded under Pennsylvania law from asserting claims for breach of fiduciary duty directly against the Individual Defendants. Two months later, all Defendants in the *Purchase* action moved to dismiss that case in its entirety. As to Mrs. Purchase's Williams Act claim, the Defendants asserted that the complaint failed to state an actionable claim with the particularity required by applicable law. As to her state law breach of fiduciary claim, the Defendants argued that there was no remaining basis for federal jurisdiction because Mrs. Purchase and the Defendants were non-diverse parties. Following extensive briefing on these matters, the Court entertained oral argument on November 13, 2006.

While these pending motions were under advisement, counsel for both parties in the *Lan* action notified the Court in correspondence dated February 20, 2007 that they

---

[2] No class was ever certified by the Court in connection with the *Purchase* action, and counsel for Mrs. Purchase never inquired of defense counsel about the possibility of stipulating to such certification at any time prior to the date on which this Court was advised in writing of the Settlement reached in the instant case.

had reached a settlement agreement in principal. Following this notice, the Court stayed further litigation in the *Purchase* action and allowed the moving Defendants in this action to withdraw their Rule 12(c) motion without prejudice to be refiled in the event final settlement was not achieved.

B.      *The Settlement Negotiations and Terms of Settlement.*

      1.      <u>The Settlement Terms</u>

The Stipulation of Settlement (the "Stipulation") provides for the payment of total Settlement Consideration equal to $5,234,277.17 (or $2.45 per share for 2,136,439.66 total shares held by the members of the Class on May 25, 2006) in settlement of all claims that were or could have been asserted in connection with the Tender Officer, including but not limited to the Williams Act and fiduciary duty claims asserted in the *Purchase* Action.

When added to the original $32.00/share offering, this additional compensation of $2.45 per share represents a total premium of 14.9% over the closing price of EFL's stock as of March 21, 2006.

Under the terms of the Settlement, no claim form or any other document is required to be filed by Class members to be entitled to participate in the Settlement. All Class members who do not request exclusion from the Class will be entitled to receive payment under the Settlement without taking any further action. The Settlement Fund plus any interest earned before distribution, less the costs of notice to the Class, administration of the Settlement, any applicable taxes and related expenses, the award of attorneys' fees and reimbursement of expenses to Plaintiffs' Counsel, and any incentive fees awarded to Plaintiffs, is defined in the Stipulation as the "Net Settlement Fund."

Upon approval of the Settlement by the Court, the Net Settlement Fund will be distributed by the Settlement Administrator *pro rata* (*i.e.*, in accordance with the ratio of each Class member's EFL shares owned on May 25, 2006 to the total 2,136,439.66

minority shares held on May 25, 2006) (i) to all Class members who have not validly excluded themselves from the Settlement, and (ii) to Erie Insurance Exchange with respect to those shares owned by Class members who validly exclude themselves. Any Net Settlement Funds (other than the *pro rata* reversion to Erie Insurance Exchange relating to valid exclusions) not ultimately paid to Class members after the expiration of 180 days from the date of the initial distribution of the Net Settlement Fund and the completion of reasonable follow-up efforts by the Settlement Administrator will be paid to an agreed-upon charity.

     2.   <u>The Settlement Negotiations</u>

From the time that Plaintiffs filed their complaint in this action and throughout 2006 and the beginning of 2007, Plaintiffs' counsel investigated, discussed and actively pursued with Defendants' counsel the possibility of resolving the action through settlement.

The settlement negotiations were conducted principally by William R. Weinstein, Esq., Plaintiffs' Class Counsel, on behalf of Plaintiffs, and John Soroko, Esq. of Duane Morris, LLP, counsel for the Corporate Defendants. Both Messrs. Weinstein and Soroko have submitted declarations in support of the Settlement providing substantial detail regarding the settlement negotiations.

Among other things, these supporting declarations confirm that the Settlement was reached as a result of extended, vigorous, and arms-length negotiations between Mr. Weinstein and Mr. Soroko, who are both experienced counsel.

These declarations establish that, by late October of 2006, Plaintiffs' Class Counsel had completed an initial review of voluminous materials produced by the defense, had pursued numerous follow-up inquires, and were pushing for formal depositions. Settlement negotiations followed thereafter, prompted in part by this Court's suggestion, on at least one occasion, that the parties consider mediation.

In fact, Messrs. Weinstein and Soroko exchanged the names of potential

8

mediators and, at one point, reached agreement as to a mediator. Ultimately, however, *Lan* counsel agreed to attempt to reach an agreement without the attendant costs of depositions or formal mediation. Mr. Weinstein represents that he viewed these costs as likely to be ultimately borne by the Class if the case was successfully resolved through negotiations.

The parties reached agreement in mid-January, 2007 based on the terms discussed above. These principal terms were memorialized in a Memorandum of Understanding ("MOU") thereafter negotiated and ultimately executed by counsel for the parties on February 15, 2006. As previously noted, the prescribed Settlement Fund, as set forth in the MOU, consists of $5,234,277.17, or $2.45 per share for 2,136,439.66 total shares held by the members of the Class on May 25, 2006, plus interest, to be paid in settlement of all claims that were or could have been asserted in connection with the Tender Offer. The MOU further prescribed that the ultimate distribution to the Class of the Net Settlement Fund would be made without the need for the filing of individual claim forms by Class members.

Mr. Weinstein's declaration establishes that he consulted with an expert financial consultant throughout the course of the negotiations, a fact corroborated by the Declaration of his expert, Candace Preston, which has also been submitted in support of the Settlement. In her declaration, Ms. Preston opines that the Tender Offer Price of $32.00 per share is not fair to the minority EFL shareholders and that a more reasonable range of fairness is $33.00 to $36.50. (*See* Decl. of Candace Preston in Support of Settlement [91] at ¶ 17.) Thus, the agreed upon Settlement Consideration is squarely in the middle of the range of reasonable values she has computed as more fair to the EFL minority shareholders than the $32 price paid by Defendants in the Tender Offer.

Mr. Weinstein's declaration further establishes that, in light of Defendants' agreement to the provision eliminating the need for the filing of claim forms, Class Counsel considered the reversion back to Defendants regarding excluded shares to be

a reasonable compromise – particularly in light of his discussions with Mr. Soroko where they both understood that the reversion was principally intended to provide funds enabling the Defendants to address, as required, any actual and potential claims of EFL shareholders – such as Mrs. Purchase – who might wish to be excluded from the Settlement.

The parties to the *Lan* settlement further agreed that an award of attorneys' fees could be based on the "pre-reversionary" amount of the Settlement fund because it was anticipated that the number of shares that might validly be excluded from the Settlement would be *de minimis*.

Finally, Mr. Weinstein states in his declaration that he had no objection to the condition demanded by Defendants that any potential settlement be accompanied by a global release of all claims, including the *Purchase* Williams Act claim, because of his personal view that the claim was legally problematic and because it did not seek damage amounts different or greater than those claimed under state law and subject to resolution by the proposed Settlement. Mr. Weinstein states that resolution of the *Purchase* Williams Act claim as part of a global settlement achieved in this action is consistent with well-established federal law in these types of federal class actions.

The Court was advised of the settlement in principle on February 20, 2007 – the day before the Court-imposed discovery cutoff established in the Court's August 21, 2006 Scheduling Order. The final settlement papers were presented to the Court for preliminary approval on April 27, 2007

3.      Preliminary Approval and Mailing of Notice

Plaintiffs filed their unopposed motion for preliminary approval of the Settlement on April 27, 2007. The Court held a telephonic hearing with counsel for all Parties both in the instant action and in the *Purchase* action on May 23, 2007.

On May 24, 2007, the Court entered the Order Preliminarily Approving Settlement (the "Hearing Order"), in which the Court, among other things: (i) certified

the Class for purposes of settlement only; (ii) preliminarily approved the Settlement; (iii) scheduled a hearing for July 12, 2007 to consider whether to approve the Settlement as being fair, reasonable and adequate, to enter final judgment thereon and to consider any application by Plaintiffs' Counsel for attorneys' fees and expenses and an award of incentive fees to Plaintiffs (the "Fairness Hearing"); and (iv) directed that notice of certification of the Class, the proposed Settlement and the Fairness Hearing, substantially in the form annexed as Exhibit B to the Stipulation (the "Notice"), be disseminated to all Class Members who could be identified with reasonable effort.

The Notice mailed to Class members advised that Plaintiffs' Counsel intended to apply for attorneys' fees in an amount equal to not more than 30% of the Settlement Fund, plus expenses and the incentive awards. Class members were also advised that if the awarded attorneys' fees, expenses, Plaintiffs' incentive fees and the costs to administer the Settlement do not exceed 33% of the Settlement Fund, then each Class member who did not request exclusion will receive payment equal to at least $1.64 for each share of EFL stock owned on May 25, 2006.

Plaintiffs' Class Counsel have submitted a Declaration from the Settlement Administrator appointed in the Hearing Order attesting that the Notice was disseminated in accordance with the Court's Hearing Order. According to the Settlement Administrator's Declaration, 1188 copies of the Notice of the Settlement were disseminated to putative Class Members. The deadline for serving objections to the Settlement or requesting exclusion from the Class expired on July 2, 2007. A total of seven exclusion requests were received, representing only 52,463 of the total 2,136,439.66 minority EFL shares subject to the Settlement. Otherwise stated, those Class Members who will be participating in the Settlement represent 2,083,976.66 shares, or 97.5%, of the total minority EFL shares subject to the Settlement.

Among the seven exclusion requests was a request on behalf of the PWH Trust with respect to 49,872 shares. This is the same entity that had previously commenced an appraisal action in connection with the Tender Offer, and the exclusion request was

a condition of a private settlement entered into between the Trust and Defendants whereby the Trust agreed to accept the same $2.45 per share consideration as was agreed to under the present proposed Settlement.

The other six exclusion requests comprise a total of 2,591 shares, or slightly more than 0.1% of the total shares subject to the Settlement.  Even as to this group, one or two of the exclusions were based on the shareholder's rationale that the original $32.00 offering was sufficient compensation.  *(See Declaration of John J. Soroko, Esq.* [Doc. # 83] at Ex. F.)

C.    *Plaintiffs' Counsels' Request for Attorneys' Fees, Expenses and Plaintiff Incentive Fees*

As compensation for their efforts on behalf of the Class, Plaintiffs' Counsel seek an award of attorneys' fees in the amount of $1,308,569.29, representing twenty-five percent (25%) of the $5,234,277.17 Settlement Fund, as well as reimbursement of expenses in the amount of $66,080.81 (including the fees and costs of the Settlement Administrator), which were incurred in connection with the prosecution and successful resolution of the Action, along with interest on these amounts at the same rate as earned by the Settlement Fund.  Plaintiffs' Counsel also request incentive fee awards for plaintiffs Lin Lan and William Morris in the amounts of $5,000 and $2,000, respectively.

1.    <u>Attorney Fees</u>

Plaintiffs' Counsel originally requested that the Court approve an award of attorneys' fees in the amount of $1,465,597.60, representing twenty-eight percent (28%) of the $5,234,277.17 Settlement Fund.

In support of their fee and expense request, Plaintiffs' Counsel have submit the Declaration of Mr. Weinstein, which provides a detailed explanation of the number of hours and usual hourly rates for the lawyers and paralegals who have worked on the

Action from its inception through Settlement, as well as the scope and nature of the work performed.  The Declaration represents that Plaintiffs' Counsel collectively will have expended a total of 923.1 hours through the date of the Final Settlement Hearing.  This time collectively results in a total lodestar of $430,176 through that date.[3]  The resulting multiplier in light of this original fee request was 3.40.

Class Member Naomi Purchase, through her primary counsel of record, Frank J. Johnson, Esq., filed an objection to this requested fee award on July 2, 2007 [Doc. # 78].  In her objection, Mrs. Purchase took the position that the requested 28% fee award was excessive and that a *total* fee award of 21% of the Settlement amount *actually paid to class members* would be appropriate.  Moreover, Mrs. Purchase argued that the 21% award should be apportioned in the ratio of 14% to Class Counsel and 7% to her own counsel.  While she advocated a total award of attorneys' fees equal to no more than *21%* of the amount actually distributed to the Class, Mrs. Purchase opined that, in all events, the total fee award should be no greater than *25%* of the Net Settlement Fund.

In light of Mrs. Purchase's objection, Class Counsel unilaterally reduced their fee application to 25% of the gross Settlement Fund.  In addition, they proposed a fee award to Mr. Johnson equal to 25% of the three-percent reduction of their own fee request (or approximately $39,257.08) as suitable compensation for his contribution toward achieving this benefit for the Class.  Class Counsel oppose any further fee award to Mr. Johnson.

Mrs. Purchase remains opposed to Class Counsels' revised fee request as the Court will discuss in more detail below.

---

[3] No time was included in those numbers for post-settlement administration by Plaintiffs' Class Counsel in conjunction with the Settlement Administrator, which Plaintiffs' Class Counsel have estimated will be no more than 5 additional hours.

2.   Expenses

Plaintiffs' Counsel collectively seek an award of expenses totaling $66,080.81. On its face, this amount equals about 1.25% of the entire Settlement Fund. Furthermore, $30,758.30 of this amount is the agreed upon total fee negotiated by Plaintiffs' Class Counsel with the Settlement Administrator, RG2, for the performance of all administrative functions, and $24,850.46 is the amount incurred by Plaintiffs' Class Counsel for the fees and expenses of his retained financial consultant/expert, Candace Preston. Invoices for those amounts are submitted with the Declaration of Plaintiffs' Class Counsel. The remaining expenses, $10,472.05, are comprised of expenditures for document reproduction, legal research, transportation, meals and lodging. Collectively, they comprise less than .2% of the total Settlement Fund. The Declaration of Plaintiffs' Class Counsel provides substantial detail about the amounts incurred by each of Plaintiffs' Counsel and the nature of the expenses incurred.

No Class Member has opposed this request. However, Mrs. Purchase and her counsel have requested reimbursement of their own expenses in the amount of approximately $15,379.[4]

3.   Incentive Awards

In support of Class Counsels' request for incentive fee awards for the two named Plaintiffs totaling $7,000, the Declaration of Class Counsel details the services they rendered to the Class. Class Counsel represents that Ms. Lan was involved in this litigation throughout, including in connection with the drafting of the complaints, responding to Defendants' document requests and interrogatories, and in connection with the status of settlement negotiations as they progressed. Mr. Morris participated in

---

[4] Mr. Johnson's declaration states that he has incurred $14,379.47 in expenses as of July 2, 2007, and he anticipated incurring an additional $1,000 in costs relative to his own attendance at the fairness hearing. *See Declaration of Frank J. Johnson* [79] at ¶¶ 21-23.

responding to Defendants' document requests and interrogatories, and also kept apprised of the developments of the case, including its ultimate Settlement.

No Class Member has opposed this request.

D.     *Class Member Objections*

There is no objection filed by any Class Member relative to the fairness, reasonableness and adequacy of the proposed Settlement, or the requests of Class Counsel for reimbursement of their expenses and incentive awards for the two named Plaintiffs.  There have been only seven requests for exclusion from the Settlement, which we address in more detail below.

There has been one objection by Mrs. Purchase to Class Counsels' requested fee award.  As matters currently stand, that objection is three-fold:  (1) Mrs. Purchase believes that any award of attorneys' fees in this case should be based on a reasonable percentage of the Settlement Funds *actually paid to the Class*, as opposed to a percentage of the *Gross* Settlement Fund; (2) Mrs. Purchase believes that a *total award of attorneys' fees equal to no more than 21%* of the Settlement Funds actually paid to the Class would be most appropriate but that, in all events, the total cap should not exceed 25% of the funds actually paid to Class members; and (3) Mrs. Purchase believes that the award of attorneys' fees should be apportioned such that her own counsel (primarily Frank Johnson, Esq.) receive an award equal to 7% of the Settlement Funds actually paid to the Class with the remainder going to Class Counsel in the *Lan* action.

In his declaration accompanying his own fee application, Mr. Johnson represents that he and his co-counsel have expended 363.4 hours in connection with the *Purchase* action, resulting in a total lodestar of $126,072.50, and have incurred expenses of $14,379.47.  Mr. Johnson has estimated that he will have expended an additional 20 hours of time resulting in $8,500 in fees in connection with his attendance at the July 12, 2007 Fairness Hearing and that he will have incurred additional related expenses

15

totaling $1,000.

## II. DISCUSSION

*A.    The Proposed Settlement*

A district court may only approve the settlement of a class action if the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In determining whether a proposed class action settlement is fair, reasonable and adequate, courts in this circuit have traditionally considered the criteria set forth in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).  These nine factors include:  (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

The *Girsh* factors are not exhaustive, however, and the Third Circuit has advised that, "because of a 'sea-change in the nature of class actions' since *Girsh* was decided in 1975, district courts should also consider other potentially relevant and appropriate factors."  *In re AT & T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006) (citing *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions,* 148 F.3d 283, 323 (3d Cir. 1998)).  These may include, *e.g.:*

> [T]he maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims

16

under the settlement is fair and reasonable.

*Id*.  (citations omitted).

1.    The Complexity, Expense and Likely Duration of the Litigation

Because the Plaintiffs' claims in this case challenge the fairness of the Tender
Offer price as well as the procedures undertaken by the Defendants in making the
Tender Offer, investigation and resolution of the claims on their merits would
necessarily involve some degree of complex financial analysis and the use of expert
testimony.  Since that is often the case in lawsuits challenging securities actions, the
Court views the factual issues in the case as somewhat complex but not unusually so
for the type of litigation involved.  In addition, because the Class claims are limited to a
single claim for breach of fiduciary duty, the legal issues are not unusually numerous or
complicated.

That having been said, however, the Court recognizes that the state of the law in
the Commonwealth which would ultimately govern the viability of Plaintiffs' claims, is
unsettled.  At the time this Settlement was reached, there remained pending before this
Court a motion for judgment on the pleadings filed by the individual Defendants in this
action.  The basis for the motion was Defendants' position that the Plaintiffs lacked
standing to assert a direct claim for breach of fiduciary duty against the directors of
EFL.  Moreover, it was the Defendants' stated intention, if the litigation were to proceed,
to further defend the case on the argument that, in all events, the EFL two-step merger
was not subject to judicial review as to its fairness because the transaction was
structured in a manner that was non-coercive and consistent with any duties
Defendants may have owed to EFL's minority shareholders.  As we discuss in more
detail below, the likely outcome of these defenses is unclear given the present state of
Pennsylvania law, which allows for competing interpretations.

Given these realities, it is highly likely that the future expense of this litigation,

and its likely duration if the Settlement were not approved, would be significant.

This proposed Settlement has been reached relatively early on in the case and, thus, before this action could ultimately get to trial, there would be substantial additional litigation necessary.  The parties would have to undertake the numerous depositions which Plaintiffs' Class Counsel agreed to defer in connection with the Settlement negotiations, as well as additional motions practice concerning the proper standard of review of the Tender Offer under Pennsylvania law.

Assuming the case survived motions practice, the cost of trying the Class's claims would be significant.  If the matter were to get to trial, the parties would have incurred additional expense in meeting the challenge of presenting complex financial analysis and testimony to the jury.  It is unclear how long such a trial would likely last.

And, because of the unsettled legal landscape governing this case, it is virtually inevitable that any verdict favorable to the Class would have been the subject of further appeal.  The same is true if the Defendants were to prevail on a dispositive legal ruling.

Thus, it is likely that the substantial delay in potentially obtaining a recovery would be accompanied by the expenditure of as much or substantially more time by counsel as was expended in the accomplishment of the Settlement.

In sum, although the Court does not view the factual and legal issues in this case as unusually complex, if this litigation were to proceed, there would certainly be significant expense and delay involved which would not likely enure to the Class Members' benefit.  To date, this litigation has resulted in over 900 hours of lawyers time and 50 hours of expert consultant time for Plaintiffs alone.  The investments by the Defendants are likely just as significant.  Therefore, the savings which this proposed Settlement would likely confer on all parties in terms of future expenses and duration of the litigation strongly favors its approval.

2.    The Reaction of Class Members

As confirmed in the Settlement Administrator's Declaration, 1,181 copies of the

Settlement Notice were mailed out.  Notice in this case has been reasonable and adequate, and no objection has been received as to the fairness of the Settlement.

In total, only seven exclusion requests representing owners of 52,463 shares of the 2,136,439.66 total minority EFL shares have been excluded from the Settlement class, leaving 2,083,976.66 shares, or 97.5% participating in the Settlement.

Moreover, of the 52,463 excluded shares, 49,872 have been specifically excluded at the request of the plaintiffs in the appraisal action captioned *PWH Trust, et al., v. Erie Family Life Ins. Co., et al.,* CCP Erie County, Docket No. 2006-15092 (the "Appraisal Action").  In fact, the plaintiffs in the Appraisal Action have opted out of the Settlement because they reached a separate agreement with Defendants to settle the Appraisal Action for the same $2.45 per share that is being paid to settle the *Lan* action, and their opting out of the Settlement was a negotiated term and requirement of the settlement reached in the Appraisal Action.

Only six other individual EFL shareholders, representing a total of only 2,591 shares, have timely requested exclusion from the Settlement class.  Collectively, these opt-outs represent slightly more than .1% of the total shares subject to the Settlement. Significantly, one or more of these shareholders have opted out of the class because they considered the initial $32.00 share price offered in the original Tender Offer to be adequate consideration.

Finally, Mrs. Purchase – who is putatively the largest shareholder Class member – has agreed that the Settlement consideration is fair and adequate, although she considers it to be on the "low side" of what is fair and adequate relief.

In sum, the overwhelming majority of EFL shareholders who are in the Settlement class, and who have received adequate notice of the Settlement, have determined that the Settlement is fair, reasonable, and adequate.  Putting aside the small percentage of opt-outs, there have been no objections filed, even from Mrs. Purchase, in regards to the amount of the Settlement.  The reaction of the Class, therefore, is a factor which strongly supports approval of the Settlement.

3. <u>The Stage of the Proceedings and the Amount of Discovery Completed</u>

This litigation was commenced in May in 2006 and, as of the time of the Fairness Hearing, had been pending approximately fourteen months. As noted above, the litigation to date has resulted in the expenditure by Class Counsel of more than 900 hours of attorney time and fifty hours of expert consultant time.

Although the proposed Settlement was achieved relatively early on in the proceedings, this was not before Class Counsel had undertaken some substantial discovery regarding the facts underlying the Plaintiffs' claim. The record here shows that the Defendants and their consultants ultimately produced in excess of 20,000 pages of documents in response to Plaintiffs' document requests and subpoenas that were reviewed by Plaintiffs' counsel in connection with the prosecution of this action. This resulted in follow up queries and answers in furtherance of Class Counsels' investigation. Additionally, the Individual Defendants' motion to dismiss served to further crystallize the legal issues in the case, and both Class Counsel and Defense Counsel have represented that they had numerous open, arm's length discussions about other legal issues that could have a material impact on the conduct and potential disposition of this action.

All of these efforts were accompanied by regular consultation with Plaintiffs' engaged financial consultant/expert to further assess the impact of various facts disclosed during discovery on the issue of what price was truly fair and adequate for the EFL shares subject to the Tender Offer. Through these efforts, Plaintiffs' Counsel gained a thorough understanding of the legal and factual issues involved in the litigation (as well as other possible claims), and the parameters governing its potential settlement.

In addition, the record reflects that, following disclosure of the proposed Settlement terms, Defendants produced to Mrs. Purchase's counsel a significant amount of informal, "confirmatory discovery," so as to afford Mrs. Purchase and her attorney the opportunity to further analyze the adequately of the settlement

20

consideration.  As set forth in the declaration of Mr. Soroko, Mr. Johnson's first set of requests were communicated to Defendants in an email dated March 4, 2007.  In responding to these requests, Defendants secured the consent of third-party consultant Cochran Caronia & Waller ("CCW") to release the approximately 18,000 pages of information that CCW had produced to *Lan* Class Counsel on October 19 and 31, 2006.  These documents were delivered to Mr. Johnson and his client on March 20, 2007.

Mr. Johnson subsequently made two additional requests for confirmatory discovery in an email to Mr. Soroko dated May 24, 2007.  These requests pertained to: (1) information confirming that the Defendants' "Statement of Beneficial Ownership of Securities" accurately reflected EFL shares owned by EFL directors and officers as well as their "agents," "representatives" and "household members"; and (2) information concerning the manner in which EFL allocated expenses between 2003 and 2005. *(See Soroko Declaration* [Doc. # 83] at Ex. B.)  In response to these inquiries, Defendants provided Mr. Johnson with two declarations:  (1) the Declaration of Linda A. Etter, stock Transfer/ Compliance Administrator for the Erie Insurance Group ("EIG"), which addressed the scope of the "Statement of Beneficial Ownership of Securities" that Defendants had previously provided to Mr. Johnson, and (2) the Declaration of Philip A. Garcia, Executive Vice President and Chief Financial Officer for EIG, which addressed the increase in EFL's General Expenses from fiscal year 2003 to fiscal year 2005.

Further, in a letter dated June 21, 2007, Mr. Johnson requested yet additional information for purposes of making a determination as to the fairness of the Settlement. *(See Soroko Decl.* at Ex. C.)  Defendants responded to this inquiry by letter dated June 26, 2007 and provided Mr. Johnson with the additional information requested regarding (i) attorneys' fees; (ii) reversion of the Settlement Funds relating to validly excluded shares; (iii) discovery; and (iv) the scope of the Settlement Class.  (*See id.* at Ex. D.)

Thus, while settlement of this action was achieved relatively early on in the litigation, it was not achieved until after Class Counsel had taken the opportunity to

engage in a significant amount of discovery, albeit informal discovery.  In addition, Mrs.

Purchase, through her counsel, received substantial information in the nature of

"confirmatory discovery."  Having had an opportunity to review this information through

her attorney, Mrs. Purchase has declined to opt out of the Settlement or to raise a

formal objection thereto.

The Court is satisfied that, in negotiating the terms of the proposed Settlement,

Class Counsel (and Defense Counsel) had an adequate appreciation of the merits

(and/or weaknesses) of their respective cases.  This factor thus favors approval of the

Settlement.


4.     The Risks of Establishing Liability

At the time the proposed Settlement was reached in this action, there remained

pending a motion filed by the Individual Defendants for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(c).  That motion was premised, in large measure, on the

Defendants' position that, under Pennsylvania law, the Plaintiffs lacked standing to

assert a direct claim for breach of fiduciary duty against the directors of EFL.  The

motion was withdrawn without prejudice to Defendants' right to reassert the motion in

the event the proposed Settlement is not approved.

Moreover, the Defendants have represented that, if this litigation were to

continue, they would further defend the case on the argument that, in all events, the

EFL two-step merger was not subject to judicial review as to its fairness because the

transaction was structured in a manner that was non-coercive and consistent with any

duties Defendants may have owed to EFL's minority shareholders.

The law controlling this point is unsettled.  Pennsylvania courts apparently have

not yet articulated a clear standard as to when, if ever, there will be judicial review of a

two-step merger.  *See In re PHLCORP*, No. 88 CIV 0306 (PNL), 1992 WL 85013 at *9

(S.D.N.Y. April 10, 1992) ("[T]here is apparently no Pennsylvania law recognizing

fiduciary duties in the context of a tender offer, in general, or a duty to auction or

otherwise maximize value in particular."); *Lewis v. LFC Holding Corp.*, No. 7974, 1985 WL 11554 at *5 (Del. Ch. Apr. 5, 1985) ("[T]here appears to be no Pennsylvania case law recognizing fiduciary duties in the context of a tender offer.")  Nevertheless, it remains the Defendants' position that, at least under Delaware law (which Defendants posit, should be considered relevant and persuasive authority), the EFL two-step merger would not have been subject to judicial review because the Tender Offer was conditioned upon a majority of the minority shareholders tendering their shares, included a promise to consummate a short-form merger at the same price, and incorporated no retributive threats.  *See Next Level Communications, Inc. v. Motorola, Inc.*, 834 A.2d 828, 846-47 (Del. Ch. 2003); *In re Pure Resources, Inc. Shareholders Litigation*, 808 A.2d 421, 445 (Del. Ch. 2002); *In re Siliconix, Inc. Shareholder Litigation*, No. Civ. A. 18700, 2001 WL 716787 at *10-14 (Del. Ch. June 19, 2001).  Defendants contend that, if this Court were to ultimately adopt the Delaware approach, the Court would be entirely precluded from reviewing the fairness of the EFL two-step merger.

Thus, both Plaintiffs' Counsel and Defense Counsel are in agreement that the law of Pennsylvania on the duties of majority shareholders and directors in factual situations like those presented in connection with the Tender Offer are unsettled, at best, and that there is Delaware authority suggesting that the method by which the Tender Offer was structured would immunize it from judicial review under the "substantial fairness" standard.  Indeed, Plaintiffs' Class Counsel opines in his declaration that this unsettled state of the law makes this case one where there could be no reasonable certainty, from Plaintiffs' viewpoint, that establishing liability is more likely than not.

This uncertainty regarding the Plaintiffs' likelihood of success in establishing liability at trial favors approval of the Settlement, particularly when balanced against the benefits of immediate settlement results.

5.    <u>The Risks of Establishing Damages</u>

The fifth *Girsh* factor is somewhat similar to the fourth factor in that it "attempts to measure the expected value of litigating the action rather than settling it at the current time." *In re Rent-Way Secur. Litig.*, 305 F. Supp. 2d 491, 505 W.D. Pa. 2003); *Erie County Retirees' Ass'n v. County of Erie, Pennsylvania*, 192 F. Supp. 2d 369, 375 W.D. Pa. 2002). Normally, proving damages involves many of the same risks as proving liability "because the former is contingent upon the latter." *Rent-Way*, 305 F. Supp. 2d at 505; *Erie County*, 192 F. Supp. 2d at 375.

If this case were to proceed to trial, Plaintiffs' ability to establish damages would depend on a battle of the experts. Plaintiffs' expert, Ms. Preston, has opined that a Tender Offer price in the range of $33.00 to $36.50 would have represented fair compensation for the affected EFL minority shares. Thus, according to Ms. Preston, the additional consideration required for a fair settlement would range from $1.00 to $4.50 per share. Mrs. Purchase's counsel represents that he has retained an expert who would opine that additional consideration as high as $8.00 per share would be required to achieve a fair compensation. No doubt Defendants would present expert testimony to establish that the $32.00 Tender Offer price was sufficiently fair compensation. At this point, however, each potential expert's opinion essentially remains untested by cross-examination, so the ultimate valuation that a jury might place on the affected EFL minority shares is extremely uncertain.

Even if the jury did accept the opinion of the Class Counsels' expert, there is no guarantee that the Class would come out ahead in the end. As Class Counsel acknowledges, Ms. Preston's damage analysis depends upon "so many criteria and conditions and provides so many different measures and ranges of value that it is entirely possible the jury could select a value no greater, or even less, than the agreed upon Settlement Consideration of $2.45 per share." (Decl. of William R. Weinstein [Doc. # 89] at ¶ 48, p. 18 of 36.)

On balance, there are substantial risks to the Class in terms of evaluating

24

damages in this case, if indeed the litigation were to proceed that far. Accordingly, this factor favors approval of the Settlement.

      6.      <u>The Risks of Maintaining the Class Action Through Trial</u>

Here, Defendants stipulated to the certification of the Class, and this Court certainly viewed this case as one where certification would be appropriate. Accordingly, the Court does not view this case as one where there would be a substantial risk of decertification were the litigation to continue. This factor alone, however, does not significantly inform the Court's analysis of the appropriateness of the Settlement.

      7.      <u>The Ability of Defendants to Withstand a Greater Judgment</u>

As to the seventh *Girsh* factor, there is no dispute here about the ability of the Defendants to withstand a greater judgment since the total damages sought, even under the best case scenario, were likely to amount to no more than $20 million. Thus, this factor does not weigh in favor of settlement, but it is ultimately outweighed by other factors that do.

      8.      <u>The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation</u>

According to the valuation analyses performed by Plaintiffs' financial expert/consultant, Candice Preston, the range of possible values for EFL minority shares subject to the Tender Offer varies from as low as $24.97 - $26.33 under one analysis, and as high as $39.54 - $48.70 under a different analysis. Importantly, however, Plaintiffs' expert opines based on all of the various analyses performed that a "more reasonable selected per share reference range" is $33.00 - $36.50. Otherwise stated, since the Tender Offer price was $32.00 per share, additional Settlement consideration in the amount of $1.00 to $4.50 per share would represent a range of

reasonable compensation to EFL shareholders. The agreed upon Settlement Consideration of $2.45 thus falls squarely in the middle of this "reasonable range" – before discounting for the risks of establishing liability or damages, or discounting for the present value of such amounts achieved two or more years down the road.

Moreover, even if we were to accept the highest valuation of EFL stock as a realistic measure of the Class's best possible recovery, the Settlement would still represent a very good recovery for the Class. Assuming a jury were to value the subject EFL shares at $48.70 per share, the best possible recovery for the Class would be $16.7 per share (i.e., $48.70 per share less the $32 per share previously paid to shareholders). The recovery achieved by the Settlement ($2.45 per share) represents approximately 14.6% of this highest valuation, further evidence that it is a very good result for the class. *See In re Cendant Corp. Litig.*, 264 F.3d 201, 242 & n. 22 (3d Cir. 2001) ("*Cendant I*") (referencing article indicating that securities class action settlements generally range between 9% and 14% of the class's total possible damages).

It is also noteworthy that Mrs. Purchase's counsel has reportedly consulted a financial expert who opines that the $2.45 per share recovery provided under the Settlement represents fair compensation, albeit on the "low end" of what he would consider to be fair – the "high end" reportedly being "around $8 per share." (*See* Decl. of Frank J. Johnson [Doc. # 79] at p. 9 of 11.)[5] Significantly though, Mrs. Purchase does not feel that the compensation is so low as to warrant either an objection to the Settlement or an opt-out.

Finally, we note that the plaintiffs in the Appraisal Action, which arose out of the Tender Offer, agreed to settled that litigation for the same amount that has been achieved here under the proposed Settlement – i.e., $2.45 per share. The Court views

---

[5] It does not appear that Mr. Johnson's expert consultant has supplied a report or declaration in support of Mrs. Purchase's papers.

this as some additional proof of the adequacy of the proposed Settlement in light of the best possible recovery and attendant risks of litigation.

On balance, the foregoing considerations strongly support our approval of the proposed Settlement.

### 9. Other Factors for Consideration

Third Circuit law requires consideration of other factors that may have relevance in determining the reasonableness and adequacy of a class action Settlement. Possible factors include "the maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions," and "the development of scientific knowledge." *In re Prudential Ins. Co.*, 148 F.3d at 323. These factors, which may have particular application in mass torts actions, have no particular application here. Nor are there any obvious factors – other than those previously discussed – "that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages." *Id.*

Similarly, consideration of "the existence and probable outcome of claims by other classes and subclasses" and "the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved – for other claimants" is not particularly helpful, because this case does not involve the certification of any subclasses. The closest comparison we could make to a subclass is those EFL minority shareholders who participated in the Appraisal Action and who, as we noted above, ultimately settled that action for the exact same consideration proffered by Defendants herein.

The Third Circuit has also informed us that we may consider as a pertinent factor whether class members are accorded the right to opt out of the settlement. *In re Prudential*, 148 F.3d at 323. In this case, they were. As we discussed previously, only a very small percentage of class members opted out and, of those who did, a large percentage were required to do so by the terms of the settlement reached in the

27

Appraisal Action. At least one or more others opted out because they felt that the original Tender Offer price of $32.00 per share represented fair and adequate consideration.

Another pertinent factor is whether the procedure for processing individual claims under the settlement is fair and reasonable. *See In re Prudential*, *supra.* We find that it is, inasmuch as class members here will automatically receive a *pro rata* share of the Net Settlement consideration in direct proportion to the number of EFL shares they owned as of May 25, 2006 (the date of completion of the Tender Offer). This distribution will not require any further claim processing or form completion on their part – a condition of settlement upon which Class Counsel was insistent because of his view that claim forms "unquestionably hamper the maximization of the payment of settlement benefits to the Class." (*See* Decl. of William R. Weinstein [Doc. # 89] at ¶ 34, p. 13 of 36.) Thus, the Plan of Allocation is plainly fair to the Class in its entirety.

Finally, we are permitted to consider as a relevant factor whether any provisions for attorneys' fees are reasonable. *In re Prudential, supra*. We defer extensive consideration of that factor here, because elsewhere the Court is making detailed findings of fact and conclusions of law in support of its award of counsel fees. Suffice to say that, in the Court's opinion, the award of counsel fees which we are sanctioning herewith is fair, adequate, and reasonable.

In light of all of the foregoing, we conclude that the terms of the proposed Settlement are likewise fair to the Class, adequate, and reasonable. Accordingly, the Settlement is approved.

B.     *Plaintiffs' Counsels' Request for Reimbursement of Expenses*

As we previously observed in *Rent-Way, supra*, "[t]here is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... reasonable litigation expenses from that fund." 305 F. Supp. 2d at 519. *See In re Corel Corp. Inc. Securities Litig.*, 293 F. Supp. 2d 484, 498 (E.D. Pa.

2003) (citation omitted).  The requested expenses of $66,080.81 are adequately documented and are reasonable in relation to the amount of the Settlement Fund.  The fact that no Class Member objected to the Settlement with expenses up to 3% of the Settlement Fund when the total claimed expenses now are a fraction of that amount further supports the reasonableness of the expense request.  Class Counsels' expenses are well below expenses awarded by this Court in other complex class actions, even accounting for the fact that this litigation was settled fairly early on in the litigation.  *See Rent-Way*, *supra*, at 519 ($283,907 in expenses awarded); *Lazy Oil Co. v. Witco Corp.,* 95 F. Supp. 2d 290, 324 (W.D. Pa. 1997) ($486,165 in expenses awarded).  Thus, the expense request is approved.

*C.     The Requested Incentive Awards*

Plaintiffs' Class Counsel has adequately documented the nature of the services rendered by Plaintiffs on behalf of the Class.  The requested amounts are entirely consistent with, or even less, than traditional amounts awarded in other class action settlements.  *See Lazy Oil*, *supra*, at 345, 324-25 (incentive awards of $5,000 to $20,000 awarded).  All Class members were advised in the Notice of the intention of Plaintiffs' Class Counsel to apply for the modest incentive awards sought, and there have been no objections.  Thus, the $5,000 incentive fee to Plaintiff Lan and the $2,000 incentive fee to Plaintiff Morris are reasonable and are approved.

*D.     Class Counsels' Request for an Award of Attorneys' Fees and Mrs. Purchase's Objections Thereto*

We next consider the application made by Class Counsel for an award of attorneys' fees equal to twenty-five percent (25%) of the Settlement Fund, or $1,308,569.29.

The Third Circuit and this Court have consistently ruled that the "percentage-of-recovery" method, rather than the "lodestar/multiplier" method, is the preferred

approach for determining attorneys' fee awards in common fund cases, subject to a "lodestar/ multiplier" cross-check.  *See In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) ("*GMC*"); *In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("*Rite Aid III*"); *Cendant I,* 264 F.3d at 256; *Rent-Way*, 305 F. Supp. 2d at 512-13, 516-17; *Erie County Retirees' Ass'n*, 192 F. Supp. 2d at 377-78; *Lazy Oil*, 95 F. Supp. 2d at 322-23.[6]

In determining an appropriate attorneys' fee award under the percentage-of-recovery approach, we are guided by the following considerations:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Rite Aid III*, 396 F.3d at 301 (*citing Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).  Our circuit court of appeals has advised that it may also be relevant to consider such factors as:  the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and any "innovative" terms of settlement.  *See In re AT&T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006); *In re Prudential*, 148 F.3d at 338-40.

These factors need not be applied in a "formulaic way" because each case is unique, "and in certain cases, one factor may outweigh the rest."  *In re AT&T Corp., supra,* at 166 (citations omitted).  The most important thing is that we "engage in [a]

---

[6] The Third Circuit has twice convened a task force to consider the methods for determining attorneys' fees in common fund cases.  *See Report of the Third Circuit Task Force*, 108 F.R.D. 127 (3d Cir. 1985) ("1985 Task Force Report") and *2001 Task Force Report; Selection of Class Counsel* ("2001 Task Force Report").  Both reports recommend the percentage of recovery approach.  *See* 2001 task Force Report at 18, 104-05.

robust assessment[ ] of the fee award reasonableness factors," *id*., so as to fairly "evaluate what class counsel actually did and how it benefitted the class." *Id*. at 165-66 (citations omitted).

1.    The Size of the Fund Created and the Number of Persons Benefitted

In *Lazy Oil, Co., supra,* we observed that, while there is no consensus as to the method for determining a reasonable percentage of attorneys' fees under the "percentage-of recovery" approach, "several courts in this circuit have observed that fee awards under [that] approach typically range from 19% to 45% of the settlement fund, with 25% being the median award." 95 F. Supp. 2d at 341 (citing cases). *See also In re Rite Aid Corp. Securities Litig.*, 396 F.3d at 303 (citing, *inter alia*, one study by the Federal Judicial Center in which it was found that the median percentage recovery range with respect to all class actions resolved or settled over a 4-year period was 27-30%); *First State Orthopaedics v. Concentra, Inc.*, — F. Supp. 2d — , 2007 WL 3054815 at *20 (E.D. Pa. Oct. 16, 2007) ("Many courts have considered 25% to be the benchmark figure for attorney fee awards in class action lawsuits, with adjustments up or down for case-specific factors...").

In most common fund cases, the procedure for arriving at a fee award "will involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage will decrease as the size of the fund increases." *Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 256 (1985) (quoted in *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir. 2001)). "The basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *In re Prudential*, 148 F.3d at 339

(citation omitted).[7]

In this case, the size of the fund (approximately $5.2 million) represents a very substantial recovery for the Class, but it is neither a "mega-fund"[8] nor an especially large fund by comparative terms. Thus, an award in the medium-to-higher range of the sliding scale is justifiable. *See, e.g.*, *Erie County Retirees' Ass'n,* 192 F. Supp. 2d at 381 ("Fee awards ranging from thirty to forty-three percent have been awarded in cases with funds ranging from $400,000 to $6.5 million, funds which are comparatively smaller than many.") (citing *Lazy Oil, Co.*, 95 F. Supp. 2d at 342-343).

As for the number of persons benefitted, Class Counsel estimate that the number of Class Members participating in the Settlement is "probably under several thousand." This number is substantial but not inordinately large. Nevertheless, the relatively small size of the Class translates into a greater proportionate recovery for each Class Member which, in Class Counsels' estimation, could average $2,000 or more. Thus, the Settlement allows a substantial recovery for individual Class members which, in turn, supports the reasonableness of the award sought by counsel.

2.      The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel

The Notice of proposed Settlement advised Class Members that Plaintiffs' Counsel would apply for a fee award of up to 30% of the Settlement Fund, plus

---

[7] Our circuit court of appeals has advised that while "it may be appropriate for percentage fees awarded in large recovery cases to be smaller in percentage terms than those with smaller recoveries," *In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 302 (3d Cir. 2005) (as amended), this is not an absolute requirement and "the declining percentage requirement concept does not trump the fact-intensive *Prudential/Gunter* analysis." *Id*. at 303.

[8] "Courts and legal commentators seem to define 'mega funds' as those consisting of at least $50 to $100 million." *In re Rent-Way Securities Litig.*, 305 F. Supp. 2d at 514 n. 5 (citing authorities).

expenses, and that any Class member could object to the Settlement or the fee application.  A total of 1,181 notice packages were sent to individual shareholders and/or brokers or nominees holding shares in "street name" on behalf of EFL shareholders.  Significantly, no one objected to the Settlement, and only one objection to the fee request has been raised – by Mrs. Purchase who, as a holder of over 60,000 shares of EFL, is putatively the largest individual shareholder affected by the Settlement.

In her papers, Mrs. Purchase strongly objects to the original request made by Class Counsel for an award of fees equal to 28% of the gross Settlement Fund.  Class Counsel have since reduced their request to a figure equal to 25% of the Fund.

Nevertheless, as matters currently stand, there is still disagreement between Mrs. Purchase and her counsel on one hand, and *Lan* Class Counsel on the other, concerning the issue of an appropriate attorneys' fee award.  In essence, Mrs. Purchase takes the following positions:  (1) any award of attorneys' fees should be based not on the Gross Settlement Fund, but on the amount of Settlement Funds *actually paid to Class members;* (2) the *total* award of counsel fees should preferably not exceed 21% of those net Settlement funds but, in all events, should not exceed 25%; and (3) the fee award should be apportioned between Class Counsel and counsel for Mrs. Purchase (Frank Johnson, Esq.) as follows:  7% of the funds actually paid to Class members should be awarded to Mr. Johnson and no more than 18% of the funds actually paid to the Class members should be awarded to Class Counsel.

Implicit in each of these arguments is Mrs. Purchase's assumption that the mandates of the Private Securities Litigation Reform Act ("PSLRA") govern, or *should* govern, this action – including this Court's resolution of the instant motions.  As to her first point – that an award of counsel fees should be premised upon the amount of Settlement proceeds *actually paid to the Class*, Mrs. Purchase bases this criterion on an express statutory requirement set forth in the PSLRA.  *See* 15 U.S.C. § 78u-4(a)(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff

class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."). With regard to her second point – that a *total* award of counsel fees in this case should not exceed 25% of the net Settlement proceeds, Mrs. Purchase argues that, as Court-appointed PSLRA Lead Plaintiff in the *Purchase* action, she has the right and duty to determine an appropriate fee award in *this* case and this Court should accord her opinion on that matter special deference. Finally, with regard to the apportionment of attorneys' fees, Mrs. Purchase contends that *Lan* Counsels' fee request is unjustified and that there is no precedent for such a sizeable award of counsel fees to "non-PSLRA lead counsel" over the objection of a PSLRA Lead Plaintiff, particularly where the agreed upon Settlement would potentially release all PSLRA claims against the Defendant.

There has been sharp disagreement among the parties regarding the merit, or lack of merit, of Mrs. Purchase's PSLRA claim. Both Defense Counsel and *Lan* Class Counsel have argued that the PSLRA claim was untenable because, among other things, the claim did not satisfy the Act's stringent pleading requirements, particularly in light of recent decisions in the cases of *Tellabs, Inc. v. Makor Issues & Right, Ltd.,* — U.S. —, 127 S. Ct. 2499, 2504-05 (2007) (holding that, to meet the PSLRA's heightened pleading requirements as to a defendants' alleged fraudulent intent, the facts must be pled with sufficient particularity as to give rise to an inference of scienter that is cogent and at least as compelling as any opposing inference of nonfraudulent intent), and *Winer Family Trust v. Queen*, 503 F.3d 319, 334-35 (3d Cir. 2007) (same). Defense Counsel have also argued that the Plaintiffs' underlying theory of wrongdoing does not logically support the existence of a PSLRA claim. Mrs. Purchase, through her attorney, has strongly disputed these assertions. She objects to Class Counsels' conduct in the present case as merely winning the "race to the courthouse" and suggests that, if the fee application of Class Counsel is granted, it will effectively

undermine the policies that underlie the PSLRA.[9]

When all is said and done, however, Mrs. Purchase's assumptions about the effects of the PSLRA on this Settlement are misplaced. This litigation was not brought under the PSLRA, is not preempted by the PSLRA,[10] and was never consolidated with

---

[9] Mrs. Purchase and her counsel repeatedly refer to the PSLRA's remedial purpose of allowing clients rather than attorneys to drive securities fraud class action lawsuits or – as one court has put it – to "create mechanisms to ensure the protection of class members' interests in securities litigation." *In re BankAmerica Corp. Securities Litig.*, 350 F.3d 747, 751 (8th Cir. 2003). The Court acknowledges Congress's intent in this regard. However, Congress was also concerned with curbing abusive securities fraud litigation and thereby providing a measure of protection for corporations and their shareholders. *See LaSala v. Bordier et CIE,* — F.3d —, 2008 WL 638266 at *2 (Mar. 11, 2008) ("Congress enacted the PSLRA because it determined that securities plaintiffs and their attorneys were bringing abusive securities class actions that had no legitimate chance of success, but, because of the expense of discovery, were enough of a nuisance to force defendants to settle non-meritorious claims.") (citing S. Rep. No. 104-98, at 9, 1995 U.S.S.C.A.N.679, 688).

The Settlement reached here, which we consider to be an arms' length agreement that is fair, reasonable, and adequate for the Class, suggests that the *Lan* Action has been constructive rather than abusive litigation. Moreover, since Mrs. Purchase (the lead PSLRA plaintiff in her own case) has agreed to partake of the Settlement, it appears that the *Lan* action has served her interests as well. It is worth noting, however, that the only significant dispute borne of this Settlement has been the issue of attorneys' fees – in particular *whose* attorneys will be paid, and *how much* they will be paid, out of the common fund.

[10] In enacting the PSLRA and, subsequently, the Securities Litigation Uniform Standards Act (SLUSA),15 U.S.C. §§ 77p & 78bb(f), Congress did not preempt *all* state law class actions that arise out of securities transactions. Notably, Mrs. Purchase does *not* contend that the PSLRA somehow preempts the state law claim for breach of fiduciary duty that is alleged in this class action, nor, apparently, could she.

Congress enacted the PSLRA largely to filter out potential "strike-suits" and to enable district courts to more easily dismiss frivolous securities fraud cases on the pleadings. *See LaSala v. Bordier et CIE,* — F.3d —, 2008 WL 638266 at *2 (Mar. 11, 2008). The PSLRA was designed to achieve this goal by, among other things, imposing more stringent pleading requirements and mandatory stays of discovery for security fraud class actions filed in federal court. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81-82 (2006). In response, plaintiffs began abandoning federal court altogether and filing class actions under state securities laws that did not impose such stringent requirements. *See id.* at 82.

To close this unintended "loophole" in the PSLRA, Congress in 1998 enacted

Mrs. Purchase's action under the PSLRA. Accordingly, this litigation, and the Settlement that has been reached herein, simply are not governed by the provisions of the PSLRA.

Mrs. Purchase suggests in her objections that the PSLRA is – or should be – controlling authority in this case by virtue of the simple fact that the Stipulation of Settlement would effectuate a release of the PSLRA claim raised in her own case. (*See* Mrs. Purchase's *Mem. of Points and Authorities* [Doc. # 78] at p. 21 of 28, n. 7 ("The fact that Lan decided to not pursue a PSLRA claim[ ] is not sufficient reason to allow the lawyers in the *Lan* Action to cleverly increase their fee by arguing that they are not bound by 15 USCS § 78u-4(a)(6). To the contrary, the Stipulation of Settlement

_____

SLUSA, which established federal court as the exclusive venue for class actions alleging fraud in the sale of certain covered securities and which mandated that such class actions be governed exclusively by federal law. *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 332 F.3d 116, 123 (2d Cir. 2003); *LaSala*, *supra* at *2 ("SLUSA undertook to close this perceived loop-hole by preventing securities plaintiffs from using the class-action vehicle to prosecute state-law securities claims."). Thus, under SLUSA, certain types of state securities fraud class actions are preempted by federal law, *to wit:* those alleging "(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1).

Notwithstanding this, SLUSA expressly leaves in place certain "covered" class actions based on state law, namely, those involving: "(I) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or (II) any recommendation, position or other communication with respect to the sale of securities of an issuer that – (aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and (bb) concerns decisions of such equity holders with respect to ... acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights."

Thus, it would appear that the class action claim raised by Plaintiffs Lan and Morris in this litigation is not preempted under SLUSA, a fact implicitly recognized by Mrs. Purchase, who (like Lan and Morris) has attempted to asserted a class action claim for breach of fiduciary duty under Pennsylvania law in addition to her PSLRA claim. *See Alessi v. Beracha*, 244 F. Supp. 2d 354, 359 (D. Del. 2003) (SLUSA did not preempt plaintiff's class action complaint alleging breach of fiduciary duty under Delaware law where gravamen of complaint was breach of defendants' duty of disclosure in connection with stock buyout offer made to small shareholders).

provides a release of all of the PSLRA claims that were, or could have been, pursued by the Court-appointed lead plaintiff.  Thus, the PSLRA applies to all terms of the settlement.")

Though it is true that Defendants have sought to obtain a global release of all potential claims arising out of the Tender Offer as part of the proposed Settlement plan, the cited language in the Stipulation has no particular effect on its own.  It is doubtful, in light of fundamental due process principles, that the Stipulation could have effectuated the dismissal of the *Purchase* litigation in the event that Mrs. Purchase had decided to opt out of the Settlement and pursue her own action.  This Court certainly would not have approved any version of the Stipulation that attempted to release Mrs. Purchase's lawsuit under such circumstances.  Simply put, Mrs. Purchase was the master of her own PSLRA ship.  Rather than sail on, she chose the safe harbor of settlement.  She has conceded the Settlement's reasonableness (although she considers it to be on the "low side" of what is reasonable compensation) and explicitly agreed to a release of her claims, including her cause of action under the PSLRA.[11]

In sum, the Settlement of this Action is not governed by the statutory mandates set forth in the PSLRA.  Thus, while the Act's requirement that an award of attorney fees be based on a percentage of the settlement *actually paid* to the Class may be informative, it does not bind this Court as a matter of controlling law.  Similarly, Mrs. Purchase's opinion as to the manner in which attorneys' fees should be awarded in this case are informative and the Court gives those opinions due consideration – particularly in light of her status as the largest individual shareholder affected by the Settlement; however, Mrs. Purchase's opinion does not ultimately control this Court's determination as to the appropriate fee amount or to whom it should be awarded.

All that being said, this Court observes the following.  First, there has been an

---

[11] Accordingly, our entry of a final order approving the Settlement herein will have the effect of dismissing the *Purchase* Action with prejudice.

overall paucity of objections to Class Counsel's application for an award of counsel fees which generally weighs in favor of the fee request, particularly since Counsels' amended request is actually 5% *lower* than the cap advertised in the Notice that was sent to Class Members.  Second, the only objection to the fee request has been lodged by Mrs. Purchase, who agrees that a *total* fee award of 25% would be reasonable, albeit she believes that the 25% should be calculated based on the net, rather than the gross, Settlement.  Third, this aspect of Mrs. Purchase's objection is premised upon her flawed assumption that the dictates of the PSLRA govern our award of counsel fees in this action.  Fourth, Mrs. Purchase, by opting to participate in the Settlement, has implicitly (if not explicitly) agreed that the Settlement is a worthwhile achievement for the Class, which in turn supports the reasonableness of Class Counsels' fee application.  Fifth, the objections of Mrs. Purchase and her counsel relative to the issue of attorneys' fees have been directed primarily at the manner of apportionment as opposed to the amount of the award.  On balance, these factors weigh in favor of granting Class Counsels' fee request.

3.     <u>The Skill and Efficiency of the Attorneys Involved</u>

This case was litigated efficiently and, it appears, with a minimum of duplication on the part of Class Counsel.  In just slightly more than 900 hours expended over a period of a little over one year, Class Counsel prosecuted this Action through the initial pleadings, initial motion practice, a substantial amount of discovery, many months of settlement negotiations, and finally, to the approval stage for a Settlement totaling in excess of $5 million.  The fact that not a single objection has been filed to the Settlement (and only a very small percentage of the affected shares have opted out of the Settlement) is strong evidence that counsel for the Class have achieved a very good result for the Class.  Although the Settlement was achieved without formal depositions being taken or mediation be conducted, the continuing "specter" of those depositions and the call for mediation by Plaintiffs' Class Counsel substantially moved

the case and its Settlement along in a fashion that minimized the expense to the parties, and thus maximized the total benefits ultimately payable to the Class.

Further, the law firms representing the Defendants, including the Duane Morris firm on behalf of EIC and Exchange, and Sullivan & Cromwell principally on behalf of the Individual Defendants, are several of the pre-eminent corporate defense firms in the nation. As such, Plaintiffs' Counsel were confronted with a formidable opposition throughout the course of these proceedings, and their substantial achievement for the Class is thereby all the more compelling.

      4.    <u>The Complexity and Duration of the Litigation</u>

The Court has previously addressed these factors in connection with our approval of the Settlement. We note here once again that, while the factual and legal issues were not unusually complex, the legal landscape against which these issues would be decided was unsettled, thereby presenting risks for both sides. As we noted before, the facts underlying Plaintiffs' breach of fiduciary duty claim raised novel legal questions as to whether the individual Defendants could properly be named as Defendants in this suit, whether a majority shareholder of an entity such as EFL owes a fiduciary duty to the minority shareholders under Pennsylvania law, and whether the Plaintiffs would be entitled to have the Tender Offer reviewed under the "substantial fairness" standard.

We also consider the duration of this litigation which has been relatively short in comparison to other class actions which have settled before this Court. While this case has now been pending for almost two years, the length of that period is somewhat misleading because, for a significant portion of the time, motions were under advisement with this Court and issues were not being actively litigated. At the time the Settlement was reached, the case had been pending only about nine months. By that time, there had been a substantial amount of paper discovery, but no depositions or interviews with adversaries had occurred and Class Counsel had consulted only with

one financial expert.  After the Court broached the subject of a stipulated class certification, the parties were able to achieve this result, to their credit, but this did not involve an expenditure of significant time or expense.  By the time the Settlement was reached, only one major motion under Fed. R. Civ. P. 12(c) had been fully briefed and argued.  While Class Counsel are certainly entitled to a certain amount of credit for their skill and efficiency (as we have already noted above), the Court finds that this factors is counter-balanced somewhat by the relative lack of complexity and relatively short duration of this litigation.

     5.    <u>The Risk of Nonpayment / Amount of Time Devoted to the Case by Class Counsel</u>

In objecting to the requested fee application, Mrs. Purchase and her counsel posit that this case did not present any risk of nonpayment because there was no risk as to the Defendants' insolvency.  Nevertheless, Class Counsel accurately point out that there was certainly some risk of nonpayment in light of the highly unsettled legal landscape against which this Court would ultimately have to assess the propriety of Defendants' conduct in connection with the Tender Offer.  Accordingly, we acknowledge that Plaintiffs' Counsel did indeed undertake a risk in prosecuting this case given the novelty of the legal issues presented and the very real risk that they might not ultimately be successful.

On the other hand, unlike other cases this Court has seen, the instant litigation did not involve an inordinate investment of Class Counsels' time prior to the achievement of a stipulated Settlement.  The proposed Settlement here was reached only nine months into the litigation, at which point (assuming court approval could be obtained) Class Counsels' risk of nonpayment became virtually nonexistent.  The record shows that, up to the point of the Fairness Hearing, Class Counsel had expended about 923 hours of lawyer time (the equivalent of about 23 full work weeks for one attorney) in prosecuting this action.  According to the Declaration submitted by

chief counsel for the Class, at least 85 of those hours were spent in post-Settlement matters such as preparation of all final settlement papers and other responsibilities in connection with moving the Settlement forward to final approval. (*See* Declaration of William R. Weinstein [Doc. # 89] at ¶ 62, p. 24 of 36.) We therefore find that the amount of time devoted to the case by Class Counsel, though not insignificant, is of relatively short duration in comparison to other class actions that have been prosecuted in this Circuit.

In sum, it is fair to credit Class Counsel with undertaking a risk of nonpayment, but this factor also is counterbalanced somewhat by the relatively limited amount of time that was invested by Class Counsel in this litigation prior to the achievement of a settlement agreement.

## 6. The Awards in Similar Cases

We also consider the fact that the fee request here – 25% of the gross Settlement Fund – is reasonably modest and well within the range that courts have awarded in cases with settlement funds of comparable size. *See, e.g., In re Vicuron Pharmaceuticals, Inc. Securities Litig.*, Civ. A. No. 04-2627, 2007 WL 1575003 (E.D. Pa. May 31, 2007) (approving counsel fees equal to 25% of the $12.75 million settlement); *Smith v. Dominion Bridge Corp.*, Civ. Action No. 96-7580, 2007 WL 1101272 (E.D. Pa. April 11, 2007) (approving fee award equal to 33.3% of $750,000 settlement fund); *Lenahan v. Sears, Roebuck and Co.*, Civ. No. 02-0045, 2006 WL 2085282 (D.N.J. July 24, 2006) (fees award equaled 30% of $15 million fund), *aff'd*, No. 06-3837, 2008 WL 466471 (3d Cir. Feb 21, 2008); *In re Ravisent Tech., Inc. Securities Litig.*, No. Civ. A. 00-1014, 2005 WL 906361 at *10-12 (E.D. Pa. Apr. 18, 2005) (fee award equaled 33% of $7 million settlement); *In re Corel Corp. Inc. Securities Litig.*, 293 F. Supp. 2d 484 (E.D. Pa. 2003) (awarding fees equal to 33.3% of $7 million fund); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.*, Civ. Action No. 94-404 (W.D. Pa. 1996) (awarding 33.3% fee from $3.6 million recovery); *Fox v. Integra Financial Corp.*, Civ.

Action No. 90-1504 (W.D. Pa. 1996) (33.3% awarded where class recovery was $6.5 million); *In re Greenwich Pharmaceutical Securities Litig.*, Civ. A. No. 92-3071, 1995 WL 251293 (W.D. Pa. Apr. 26, 1995) (approving award equal to 33.3% of the $4.375 million settlement fund and noting that "cases with smaller settlement funds often include attorneys' fee awards that exceed the median of 25 percent"); *In re Fiddler's Woods Bondholders Litigation*, Civ. A. No. 83-2340, 1987 WL 19239 (E.D. Pa. Oct. 28, 1987) (32.8% awarded out of $6.477 million settlement fund).

The fact that the requested fee represents a percentage of recovery at or below the traditional range for similarly situated settlements and *lower* than the percentage described in the Notice of Settlement disseminated to the Class (which produced only one objection to the fee application) supports the conclusion that it is reasonable. This conclusion is further supported by the fact that even Mrs. Purchase does not object to a total fee award of 25%, provided that it be based on the *net* Settlement Fund and that her own counsel share in a significant portion of it.


7. <u>Other Relevant Factors</u>

Our circuit court of appeals has instructed that it may be relevant, in our fee award calculus, to consider such factors as the degree to which the benefits accruing to class members are attributable to the efforts of Class Counsel, as opposed to the efforts of other groups, such as government agencies conducting investigations. *See AT&T Corp.*, 455 F.3d at 165; *In re Prudential*, 148 F.3d at 338-40. This case is not one where governmental agencies or other bodies conducted investigations or otherwise laid the groundwork either for the lawsuit or for the Settlement. In fact, the only contention along these lines is the assertion by Mrs. Purchase's attorney that the *Purchase* Litigation was an instrumental factor in achieving the Settlement for the *Lan* Class – a claim which Class Counsel strongly deny. As we discuss in more detail below, the record does not support Mrs. Purchase's assertion. Rather, it appears that the benefits achieved for Class Members through the Settlement in this action are

attributable predominantly, if not exclusively, to the efforts of Class Counsel who initiated their own investigation and prosecuted this action against highly skilled defense counsel.

The other potentially relevant factors do not weigh significantly in our calculus. No "innovative" terms of settlement apply here, nor is there any evidence in this record as to the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel were retained. Nevertheless, the Court notes that, in its experience, contingency fees in the range of 33-40% are not uncommon. This consideration further buttresses the reasonableness of Class Counsels' fee application.

In sum, almost all of the factors which the Third Circuit has advised us to consider favor approval of the fee award requested by Class Counsel. The only two factors which do not strongly support approval of the fee award in this case are the fact that the duration of the litigation and the amount of time which Class Counsel has devoted to the case have both been relatively short, particularly up to the point at which the proposed Settlement was reached. Nevertheless, we find that these facts are outweighed by the following considerations: (1) since the litigation did not involve particularly complex factual or legal issues, less time was required of Class Counsel in order to adequately develop the case; (2) the amount of time devoted by Class Counsel, while not inordinately large, is still substantial and resulted in substantial discovery and work product; (3) the fact that more time has not been devoted to the case by Class Counsel is, to some degree, attributable to Counsels' skill and efficiency in achieving a settlement early on (for which Counsel should receive appropriate credit); (4) the fee request by Class Counsel here is relatively modest when compared to fee awards (often 30-33%) granted in cases involving funds of comparable size; and (5) the Settlement arrived at by Class Counsel, in the end, has produced a very good result for the Class.

8.    The Lodestar/Multiplier Cross-Check

Our circuit court of appeals has advised that "'it is sensible for a court to use a second method [i.e., the lodestar/multiplier method] of fee approval to cross check' its initial fee calculation" under the percentage-of-recovery approach.  *Gunter*, 223 F.3d at 195 n.1.  When we do so, however, we are required "to explain how the application of a multiplier is justified by the facts of a particular case."  *In re Prudential*, 148 F.3d at 340-41.

Here, Class Counsel have spent a total of 923.1 hours litigating this case.  Applying Class Counsels' normal hourly rates to the hours expended, the resulting lodestar figure is $430,176.[12]  The requested fee award produces a multiplier of 3.04.

It has repeatedly been observed by courts in this circuit that "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."  *In re Prudential,* 148 F.3d at 341 (*quoting* 3 Herbert Newberg & Alba Conte, Newberg on Class Actions, § 14.03 at 14-5 (3d ed. 1992)).  *See also First State Orthopaedics v. Concentra, Inc.*, — F. Supp. 2d. at —, 2007 WL 3054815 at *21; *In re Vicuron Pharmaceuticals, Inc. Sec. Litig.*, 512 F. Supp. 2d at 287; *Smith v. Dominion Bridge Corp.*, *supra*, at * 10; *In re Corel Corp. Inc.,* 293 F. Supp. 2d at 497; Rentway, 305 F. Supp. 2d at 517.  The multiplier produced here is obviously within the 1-4 range.

Nevertheless, Mrs. Purchase and her counsel refer us to *In re Cendant Corp. PRIDES Litig. ("Cendant PRIDES")*, 243 F.3d 722 (3d Cir. 2001) as authority for the proposition a multiplier of 3 is the appropriate ceiling for a fee award in this circuit.  *Id*. at 742.   In that case, the court of appeals ruled that the district court had abused its

---

[12] The average hourly rate, given these figures, works out to be $466.00.  Considering that most of the work performed in this case was done by counsel practicing in New York City, we consider this to be an acceptable average hourly rate.  We note that no objections have been lodged as to Class Counsels' normal billing rates.

discretion in awarding counsel fees in the amount of $19.3 million – or 5.7% of the $341.5 million settlement fund. Depending on the method used to calculate the applicable lodestar, the resulting multiplier ranged from 7 to 10. The court of appeals found that this was excessive in light of the fact that the case "was neither legally nor factually complex and did not require significant motion practice or discovery by [counsel], and the entire duration of the case from the filing of the Amended Complaint to the submission of a Settlement Agreement to the District Court was only four months." 243 F.3d at 742-43. Indeed, discovery in that case was "virtually nonexistent" (the district court did not even mention any depositions taken or document review conducted), *id*, at 736, the Defendant had conceded liability, and there were no risks relative to liability or collecting damages. *Id* at 735. In analyzing the fee award by the district court, the court of appeals surveyed a number of cases involving similar mega-fund settlements and noted that the multipliers in those cases – which, by comparison, had involved much more extensive work by counsel – never exceeded 2.99. The Third Circuit therefore vacated the award of counsel fees and remanded the case with the "strong[] suggest[ion] that a lodestar multiplier of 3 ... is the appropriate ceiling for a fee award, although a lower multiplier may be awarded in the District Court's discretion." *Id*. at 742.

Although the Third Circuit's analysis in *Cendant PRIDES* is obviously informative, we do not read it as establishing a *per se* ceiling of 3 for lodestar multipliers in every case. On the contrary, we interpret the ruling in *Cendant PRIDES* as largely fact driven and, indeed, the Third Circuit has since confirmed that multipliers in appropriate cases may be greater than 3. *See, e.g, AT&T Corp.*, 455 F.3d at 172-73 ("We have noted that the lodestar multiplier 'need not fall within any pre-defined range, provided that the District Court's analysis justifies the award.'") (citation omitted); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 303-04 (upholding a fee award resulting in a multiplier of 4.07, distinguishing the facts involved in *Cendant PRIDES*, and noting that the suggestive multiplier ceiling therein was "tied to the facts of that case").

45

In any event, the fee request here results in a multiplier (3.04) that only barely exceeds the ceiling recommended in *Cendant PRIDES*. Although the number of hours devoted by Class Counsel in this case is not particularly large, this case – in contrast to *Cendant PRIDES* – has produced a significant amount of merits related discovery and analysis, which has helped to move the Settlement along. We conclude that a multiplier of 3.04 can be justified by the skill and efficiency demonstrated by Class Counsel in this litigation.

E.    *The Request of Mrs. Purchase's Counsel for Payment of Fees and Reimbursement of Expenses*

Lastly, we must determine whether counsel for Mrs. Purchase is entitled to an award of attorneys' fees and expenses. Specifically, Mr. Johnson has applied for counsel fees in an amount equal to seven percent (7%) of the Net Settlement Fund.[13] He also claims expenses in the amount of $15,379.47 in connection with the prosecution of this action up to and including the Settlement hearing.[14]

Because we have determined that the mandates of the PSLRA do not govern our resolution of the instant motions, we must apply traditional common-fund principles in considering Mr. Johnson's fee request. Recently, the Third Circuit expounded upon these principles in the case of *In re Cendant Corp. Secur. Litig ("Cendant II")*, 404 F.3d 173 (3d 2005). In discussing the changes wrought by the PSLRA, the court observed that the PSLRA and the common fund doctrine are in "significant tension" concerning awards of counsel fees and that, in the context of a PSLRA case, the common fund

---

[13] Mr. Johnson represents that he has incurred lodestar fees totaling $126,072.50 through July 2, 2007, and he has estimated that he would expend twenty (20) additional hours in connection with attending the Fairness Hearing which, at his usual hourly rate of $425, amounts to $8,500.

[14] Mr. Johnson's affidavit establishes that he incurred $14,379.47 in unreimbursed expenses through July 2, 2007 and he anticipated incurring an additional $1,000 in expenses in connection with attending the Fairness Hearing.

doctrine "survives most robustly in the period running from the accrual of the cause of action to the appointment of lead plaintiff." *Id*. at 193.

Notably for our purposes, the court went on to discuss how common fund principles should be applied when considering fee requests made by non-lead counsel relative to work performed during this period. It summarized the relevant analysis as follows:

> [W]e do not think that attorneys can simply manufacture fees for themselves by filing a complaint in a securities class action. On the other hand, attorneys who alone discover grounds for a suit, based on their own investigation rather than on public reports, legitimately create a benefit for the class, and comport with the purposes of the securities laws. Such attorneys should generally be compensated out of the class's recovery, even if the lead plaintiff does not choose them to represent the class. More generally, attorneys whose complaints contain factual research or legal theories that lead counsel did not discover, and upon which lead counsel later rely, will have a claim on a share of the class's recovery. In most cases, ... we expect that lead plaintiffs who make use of earlier attorneys' legal or investigative work will request compensation for such attorneys. In the unlikely case that lead plaintiffs appropriate that work and attempt to deny compensation, we expect that the court will nonetheless reward the earlier attorney's work on behalf of the class.

> We emphasize that, in determining who is entitled to attorneys' fees for pre-appointment work, the court's only consideration must be whether or not the attorney's work provided benefits to the class. The mere fact that a non-designated counsel worked diligently and competently with the goal of benefiting the class is not sufficient to merit compensation. Instead, only attorneys "whose efforts create, discover, increase, or preserve" the class's ultimate recovery will merit compensation from that recovery. *GMC*, 55 F.3d at 820 n. 39. To the extent that the Tenth Circuit's pre-PSLRA decision in *Gottlieb v. Barry*, 43 F.3d 474 (10th Cir.1994), is in tension with this holding, we reject Gottlieb's suggestion that duplicative but useful work will always be compensable, and that "the quality of the attorneys' legal services" will be somehow dispositive. ...

404 F.3d at 197-98.

Thus, at its core, the touchstone for determining whether a non-lead counsel is entitled to compensation is whether that counsel's work conferred an "independent benefit" upon the Class:

> [W]hile all of lead counsel's work will likely be compensable, *see supra* note 12, other attorneys who merely duplicated that work - however noble their intentions, however diligent their efforts, and however outstanding their product - will not be entitled to compensation. Only those who confer

an independent benefit upon the class will merit compensation.

> To summarize, responsibility for determining fees for the work of non-lead counsel performed before the appointment of the lead plaintiff will rest, in the first instance, with the district court, though that court may ask the lead plaintiff for guidance in evaluating claims for fees.  Only work that actually confers a benefit on the class will be compensable; in the ordinary case, simply filing a complaint that is substantially identical to other complaints will not by itself warrant compensation.

*Id*. at 197.

We have previously noted (albeit, in the context of a PSLRA case) that "objectors are entitled to compensation for attorneys' fees and expenses if the settlement was improved as a result of their efforts," *In re Rent-Way Secur. Litig.*, 305 F. Supp. 2d at 520 (citations omitted), and this includes situations where an objector is successful in challenging an award of attorneys' fees to lead class counsel. *Id*. *See also In re Prudential Ins. Co. of America Sales Practices Litig.*, 273 F. Supp. 2d 563, 565 (D.N.J. 2003).  Here, the record supports a finding that Mr. Johnson was instrumental in causing *Lan* Class Counsel to reduce their fee application from 28 percent of the Settlement Fund to 25 percent, and Class Counsel have acknowledged as much.

Beyond that, however, the Court finds no support in the record for an award of fees to Mr. Johnson.  In his papers, Mr. Johnson insists that his efforts in litigating Mrs. Purchase's Williams Act claim was instrumental in motivating Defense Counsel to stipulate to the certified class in *Lan* and to broker the subject Settlement.  Mr. Johnson notes that the Settlement (which seeks to dismiss all outstanding or potential claims relative to the Tender Offer, including the *Purchase* claims) was not achieved until *after* he had:  investigated EFL's trading history and analyzed EFL's SEC documents and other publically available information; filed a detailed complaint including the *Williams Act* claim; consulted with a financial expert about the technical aspects of the case; filed a 38-page Amended Complaint and defended the same against a motion to dismiss; propounded discovery requests relative to the *Williams Act* claim; and prepared a

48

motion to compel relative to the foregoing discovery. "These efforts," Mr. Johnson insists, "were undoubtedly a significant motivating factor in [D]efendants' decision to stipulate to certify the *Lan* Action and broker a deal with Lan Counsel so that [D]efendants could settle on a class-wide basis, but avoid the PSLRA Lead Plaintiff and PSLRA Lead Counsel scrutiny pursued under the authority of the PSLRA." (Mem. of Points and Authorities [Doc. 78] at p. 22.) In fact, Mr. Johnson predicts that "[e]ven [D]efendants' counsel would have to admit that settlement discussions were motivated by the *Purchase* Action and the efforts undertaken by PSLRA Lead Counsel." *Id.* at n.9.

      Unfortunately for Mr. Johnson, Defense Counsel make no such admission. On the contrary, the declaration submitted by John J. Soroko, Esq., lead counsel for Defendants in both the *Lan* and *Purchase* cases, establishes that the Settlement was the result of extended, vigorous, and arms-length negotiations between himself and Mr. Weinstein. (Decl. of John J. Soroko, Esq. [Doc. # 83] at p.2 ¶ 6.) According to Mr. Soroko, these negotiations were prompted not by the efforts being undertaken by Mr. Johnson on behalf of his client, but by this Court's suggestion on one or more occasions that the parties consider mediation. *Id.* Mr. Soroko explains that the negotiations "followed the Defendants' production to Mr. Weinstein of voluminous discovery materials, Mr. Weinstein's review of such materials, our having responded to numerous follow-up inquiries from Mr. Weinstein, and Mr. Weinstein's indication of his intention to pursue various depositions." *Id.* Mr. Weinstein's declaration outlines in some detail the general course which these negotiations took over the course of many months, as both parties to the *Lan* action vigorously bargained their way to the final settlement figure. (*See generally* Decl. of William R. Weinstein, Esq. [Doc. # 89] at pp. 10-13, ¶¶ 24-33.)

      Because this is a common fund situation and our award of attorneys' fees will not affect the total amount of Settlement consideration paid by the Defendants, the latter have not taken any particular position with respect to Mr. Johnson's fee application.

Notably, however, Mr. Soroko specifically denies any suggestion that the Stipulation Regarding Class Certification in the *Lan* action was done surreptitiously as an effort to evade litigation in the *Purchase* case; on the contrary, Mr. Soroko states that the stipulation was prompted after this Court articulated its preference that the matter be handled by way of stipulation, if possible. (Decl. of John J. Soroko, Esq. at ¶¶ 12-15.) Mr. Soroko further specifically denies any suggestion that the *Lan* Settlement was a product of Defendants' attempt to avoid answering discovery on the *Williams Act* claim. (*Id.* at ¶¶ 20-21.)

Thus, Mr. Johnson's suggestion that his efforts on behalf of Mrs. Purchase in effect intimidated the Defendants into settlement is not supported by the record. In fact, at the time the proposed Settlement had been reached, this Court had pending before it a motion by the Defense to dispose of the *Purchase* Action in its entirety. In light of the pendency of the proposed Settlement, Defendants were permitted to withdraw that motion *without prejudice* to be reasserted in the event this Settlement did not receive court approval. Significantly, even if the Williams Act claim had survived the initial pleading stage and had been litigated to a successful conclusion, it would not have provided any basis for an award of damages different or greater than that which could be obtained under the *Lan* Plaintiffs' state law breach of fiduciary duty claim.

We also note that Mr. Soroko's declaration outlines substantial efforts on Mr. Johnson's part to obtain discovery that would confirm to his client's satisfaction the adequacy of the Settlement. However, these efforts did not independently confer any additional benefit upon the Class and, therefore, they are not compensable out of the common fund.

Finally, we note that Mr. Johnson has applied for an award of expenses in the amount of $14,379.47, and he estimates that an additional $1,000 will have been incurred in connection with these Settlement Hearing proceedings. However, Mr. Johnson's declaration does not outline in any detail how these expenses were necessary to his efforts in achieving the limited benefit to the Class that we have

discussed above.  Indeed, it appears that most of Mr. Johnson's expenses were incurred in prosecuting his client's Williams Act claim which, based on this record, we do not find to be the basis of any independent benefit conferred upon the Class.

### III.  CONCLUSION

For the reasons previously discussed, the Court will approve the Settlement herein as fair, reasonable, and adequate for the Class.  The Court will award *Lan* Class Counsel attorney fees in an amount equal to 25% of the Gross Settlement Fund.  The Court will further award Class Counsel their requested expenses.  The Court will award incentive fees to Plaintiffs Lan and Morris in the amounts of $5,000 and $2,000 respectively.  Finally, the Court will award compensation to Mr. Johnson in an amount equal to 25% of the additional funds which will be contributed toward the Settlement in light of Class Counsels' reduction in their fee request from 28 percent to 25 percent of the Settlement Fund.[15]  Because an appeal over the issue of counsel fees is likely to occur, this Court will order that 7% of the Settlement Fund be held in an interest-bearing escrow account pending resolution of those claims or expiration of the appeal period.

An appropriate order follows.

---

[15] That amount is calculated as follows:  28% of the Gross Settlement Fund ($1,465,597.60) less 25% of the Gross Settlement Fund ($1,308,569.29) results in an additional benefit of 3% (or $157,028.31) to the Class.  Mr. Johnson will be awarded 25% of that amount, or $39,257.08.

**IN THE UNITED STATES COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

LIN LAN and J. WILLIAM MORRIS,                )
on behalf of themselves and all               )
others similarly situated,                    )
                                              )        1:06cv114-SJM
                      Plaintiffs,             )
                                              )
         v.                                   )
                                              )
JEFFREY A. LUDROF, et al.,                    )
                                              )
                      Defendants.             )

**O R D E R**

AND NOW, *to wit*, this 21st day of March, 2008, for the reasons set forth in the accompanying Memorandum Opinion, which constitutes this Court's findings of fact and conclusions of law,

IT IS HEREBY ORDERED as follows:


1.    Plaintiff's Motion [Doc. # 87] for Final Approval of the Proposed Class Action Settlement is GRANTED;


2.    Plaintiffs' Counsels' Motion [Doc. # 85] for an Award of Attorneys' Fees, Reimbursement of Expenses, and Plaintiffs' Incentive Fees, *as modified*, is GRANTED;


3.    The Objection of Naomi Purchase to Class Counsels' fee application is OVERRULED;


4.    The Request of Frank J. Johnson, Esq. for an award of counsel fees and reimbursement of expenses is GRANTED to the extent that Mr. Johnson

will be awarded $39,257.08 in counsel fees; in all other respects said request is DENIED; and

5.    In light of the likelihood of an appeal concerning the issue of Mr. Johnson's fee request, seven percent (7%) of the Settlement Fund shall be set aside in an interest-bearing escrow account pending final resolution of Mr. Johnson's fee request on appeal or expiration of the appeal period.


                                        s/    Sean J. McLaughlin
                                              SEAN J. McLAUGHLIN
                                              United States District Judge


cm:   All counsel of record.
      Frank J. Johnson, Esq.
      Arthur D. Martinucci, Esq.